### SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**Giuseppe B. TOME, Paolo Mario Leati, Lombardfin S.p.A., Transatlantic Financial Co., S.A., Nayarit Investments, S.A., Finvest Underwriters and Dealers Corp., Certain Purchasers of the Common Stock and Call Options for the Common Stock of St. Joe Minerals Corp., and Banca Della Svizzera Italiana, Defendants.**

**No. 81 Civ. 1836 (MP).**

United States District Court,
S.D. New York.

June 3, 1986.

Ira Lee Sorkin, Regional Adm'r, S.E.C. by Anne C. Flannery, Robert B. Blackburn, Joseph G. Mari, Philip M. Giordano, Jennifer M. Russell, New York City, for plaintiff.

John F.X. Peloso, Daniel B. McIntyre, Sage Gray Todd & Sims, New York City, for defendant Giuseppe B. Tome.

Bruno Schachner, New York City, for defendants Transatlantic Financial Co., S.A., Nayarit Investments, S.A., Finvest Underwriters and Dealers Corp.

Chester J. Straub, David Trachtenberg, Willkie Farr and Gallagher, New York City, for defendant Banca Della Svizzera Italiana.

## MEMORANDUM

MILTON POLLACK, Senior District Judge.

### Evidentiary Rulings

During the course of the non-jury trial herein, motions were presented by the parties for evidentiary rulings on which decision was reserved. The questions raised by the parties relate to the effect to be given to defendant Tome's assertion of his Fifth Amendment privilege against self-incrimination and to the admissibility of portions of depositions and other exhibits submitted as evidence.

A. *The Effect of Tome's Assertion of His Fifth Amendment Privilege Against Self-Incrimination*

■ The plaintiff SEC sought to obtain responses from defendant Tome to interrogatories to be addressed to him in Switzerland. In an affidavit, Tome asserted his Fifth Amendment privilege against self-incrimination and refused to answer any interrogatories related to the transactions at issue in this case. Tome contends, however, that it is constitutionally impermissible for this Court to draw an adverse inference from that assertion of the privilege. Implicitly conceding that an adverse inference may be drawn in a civil case between private parties, Tome contends that it is constitutionally impermissible for this Court to do so in a civil case in which the government is the plaintiff or in which the defendant invoking the privilege is also a defendant in a parallel criminal proceeding. He relies upon language in a dissent in *Baxter v. Palmigiano*, 425 U.S. 308, 334, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (Brennan, J. dissenting) and some glancing dicta in *SEC v. Musella*, 578 F.Supp. 425, 431 (S.D.N.Y.1984). Tome's contention is contrary to the settled law. *See United States v. Segal*, 549 F.2d 1293, 1299 (9th Cir.) (*Baxter* "held that a negative, though not conclusive, inference can be drawn from the failure of a prisoner to testify ... even though the testimony if given could lead to criminal prosecution."), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2187, 53 L.Ed.2d 231 (1977).

The authorities cited below would have fully justified drawing an adverse inference against Tome from his assertion of the privilege against self-incrimination herein. In the circumstances presented, however, it is unnecessary to utilize the inference to establish liability. Even if needed to establish liability, it would have been merely one inference among a number of evidentiary factors considered by this Court in reaching its conclusions. Tome's liability herein has been established by a preponderance of the credible evidence, without regard to the adverse inference.

*Baxter, supra,* established that the Constitution does not prohibit drawing an adverse inference from a party's assertion of the privilege in civil cases since "silence in the face of accusation is a relevant fact.... [and] 'is often evidence of the most persuasive character.'" *Baxter*, 425 U.S. at 319, 96 S.Ct. at 1558 (quoting *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54, 44 S.Ct. 54, 56, 68 L.Ed.2d 221 (1923) (Brandeis, J.)). The next year, in *Lefkowitz v. Cunningham*, 431 U.S. 801,

808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977), the Supreme Court read its *Baxter* decision to mean that:

> *Baxter* did no more than permit an inference to be drawn in a civil case from a party's refusal to testify. Respondent's silence in *Baxter* was only one of a number of factors to be considered by the finder of fact in assessing a penalty, and was given no more probative value than the facts of the case warranted[.]

The Second Circuit has interpreted the *Baxter* rule to apply to witnesses as well as parties and through these witnesses, former employees of a party, against a party. *Brink's Inc. v. City of New York*, 717 F.2d 700, 708–10 (2d Cir.1983).

Subsequent to *Baxter* and *Lefkowitz, supra*, decisions by federal courts have established that an adverse inference is equally to be drawn where the government is a party to the civil proceeding. *see e.g., FTC v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1291 (D.Minn.1985) (adverse inference drawn in an FTC enforcement action); *United States v. Local 560, International Brotherhood of Teamsters*, 581 F.Supp. 279, 306 (D.N.J.1984) (adverse inference drawn in a civil RICO case brought by the government), *rev'd as to this point on other grounds*, 780 F.2d 267, 292–93 n.32 (3d Cir.1985); *CFTC v. U.S. Metals Depositary Co.*, 468 F. Supp. 1149, 1162 & n. 56 (S.D.N.Y.1979). Particularly relevant hereto, courts have drawn an adverse inference in enforcement actions brought by the SEC. *See e.g., SEC v. Netelkos*, 592 F.Supp. 906, 917–18 (S.D.N.Y.1984); *SEC v. Musella*, 578 F.Supp. 425, 429–30 (S.D.N.Y.1984); *SEC v. Scott*, 565 F.Supp. 1513, 1533–34 (S.D.N.Y.1983), *aff'd sub nom., SEC v. Cayman Islands Reinsurance Corp.*, 734 F.2d 118 (2d Cir.1984); *SEC v. Gilbert*, 79 F.R.D. 683, 686 (S.D.N.Y.1978). In addition, federal courts have held that the pendency of related criminal proceedings is irrelevant in determining whether to draw an adverse inference, *see e.g., Diebold v. Civil Service Commission*, 611 F.R.D. 697, 701 (8th Cir.1979) (holding that the fact that the defendant asserting the privilege in a civil action has already been indicted "has no bearing on the constitutional issues involved"); *Roberts v. Taylor*, 540 F.2d 540, 542 (1st Cir. 1976) (stating that the *Baxter* decision does not "accord leeway" for distinctions between a situation in which criminal charges are pending and a situation in which only a *possibility* of criminal charges are involved), *cert. denied sub nom., Roberts v. Director, Department of Corrections*, 429 U.S. 1076, 97 S.Ct. 819, 50 L.Ed.2d 796 (1977), and many decisions have drawn an adverse inference when criminal charges are pending. *See e.g., Hoover v. Knight*, 678 F.2d 578, 582 & n. 1 (5th Cir.1982); *Book v. United States Postal Service*, 675 F.2d 158, 160 n.4 (8th Cir. 1982) (per curiam); *Arthurs v. Stern*, 560 F.2d 477, 478 (1st Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *Rhode Island v. Cardillo*, 592 F.Supp. 655, 658 (D.R.I.1984); *Marcello v. Long Island Railroad*, 465 F.Supp. 54, 61 (S.D.N.Y.1979).

The permissible adverse inference has been used, however, only for the purpose of determining the *scope* of Tome's liability, following a determination of his liability without use of that inference. It is used herein only for some of the transactions engaged in by those whom Tome tipped regarding the Seagram tender offer for St. Joe, specifically the transactions engaged in by Banque Gutzwiller and by Trade Development Bank.

### B. *Objections To Testimony and Exhibits*

Except for two live witnesses testifying at trial, Marc Cohen, an analyst in mining industries for the brokerage firm of Kidder, Peabody & Co., and Kevin Feehan, the New York Stock Exchange specialist in St. Joe stock, all testimony in this case was received by deposition testimony. All parties appearing in this action stipulated that the deposition testimony would be admissible as though that person were testifying live at trial, and thus absence from the trial poses no hearsay objection because of that absence.

The testimony of some foreign nationals, Mrs. Patricia Arbucias, Mr. Riccardo Argenziano, and defendant Leati, all officers and/or directors of defendant Lombardfin S.p.A., was taken pursuant to a special Letter Rogatory procedure. The range of questions permitted in such proceedings is much narrower than the range permitted in our deposition procedure; thus the information obtained is much less complete.

After giving the parties an opportunity to object on the grounds of competency, relevancy, or hearsay, to the receipt by the Court of any portions of any of the deposition testimony, defendant Tome, joined by defendants NICO, TFCO, and Finvest Panama, objected to three isolated statements in Bronfman's deposition and to Csopey's deposition testimony to the extent that he repeated what Leati told him that Tome had said in telephone conversations between Leati and Tome on March 10, 1981. All other possible objections to the deposition testimony are waived.

In addition, both plaintiff and defendants objected to documents offered into evidence as exhibits. The SEC's objections are overruled and all of defendants' exhibits, including those offered after the trial on October 23, 1985, are received into evidence. The defendants' objections to the SEC's exhibits are sustained in part, overruled in part as discussed below in more detail.

### 1. *Defendants' Hearsay Objections To Csopey's Testimony*

Defendants object to Csopey's testimony on hearsay grounds to the extent that he testified concerning what his partner Leati had told him about business telephone conversations between Tome and Leati on March 10, 1981. Csopey was an interested party in the business. The SEC asserts that this contested testimony is not hearsay since it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Rule 801(d)(2)(E), Fed.R.Evid. The SEC claims that since

Leati was Tome's coconspirator in the illegal St. Joe purchases, Leati's statements to Csopey are admissible against Tome since they were made during the course of and in furtherance of. the conspiracy. In the alternative, the SEC argues that even if the contested statements are hearsay, several exceptions to the hearsay rule are applicable. Since the coconspirator exclusion from hearsay, Rule 801(d)(2)(E), by itself permits receipt of the matter objected to, it is unnecessary to discuss the SEC's other grounds for admitting the contested testimony.

Although the vast majority of cases discussing the coconspirator exclusion from the hearsay rule are criminal cases, *see generally* Annot., *Admissibility of Statement By Coconspirator Under Rule 801(d)(2)(E) of Federal Rules of Evidence,* 44 A.L.R.Fed. 627 (1979) (collecting cases), it is clear that the rule is equally applicable to civil cases. Rule 1101(b), Fed.R.Evid.; *see e.g., Filco v. Amana Refrigeration, Inc.,* 709 F.2d 1257, 1267 (9th Cir.) (discussing coconspirator exclusion in a civil case), *cert. dismissed,* 464 U.S. 956, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983); *Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 80–81 (2d Cir.1980) (same), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). There is a paucity of civil cases involving the coconspirator exclusion, however, and it is not clear whether the same principles applicable to its use in the criminal area are equally applicable in the civil area. *See generally* Note, *Reconciling The Conflict Between The Coconspirator Exemption From The Hearsay Rule and The Confrontation Clause of The Sixth Amendment,* 35 Colum.L.Rev. 1294 (1985) (discussing possible Confrontation Clause problems on the criminal side). *But see United States v. Inadi,* — U.S. —, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (holding that the Confrontation Clause does not require a showing that the declarant is unavailable as a condition to admission of out-of-court statements by a nontestifying coconspirator).[1] In addition, the coconspira-

---

**1.** The *Inadi* opinion did not purport to address       another possible Confrontation Clause concern

tor exemption, in effect, would be rendered a nullity on the civil side if courts required the same quantum of proof in civil actions that is presently applicable in criminal actions, *i.e.*, the preponderance of the evidence standard, *see United States v. Ciambrone,* 787 F.2d 799, 807 (2d Cir.1986); *United States v. Geaney,* 417 F.2d 1116, 1120 (2d Cir.1969), *cert. denied sub nom., Lynch v. United States,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), before the coconspirator's statement is admissible. Were a party to a civil action required to prove the existence of the conspiracy by a preponderance of the nonhearsay evidence before the coconspirator's statement is admissible, the coconspirator's statement would be merely corroborative evidence tending to reinforce the case already proved.[2] Perhaps this insight explains the dearth of civil cases addressing the coconspirator exclusion from the hearsay rule.

In this case, however, it is unnecessary to determine whether the predicate for admission of the coconspirator's statement is lower on the civil than on the criminal side since the SEC has proved the existence of a conspiracy by a preponderance of the independent evidence, *i.e.*, by admissible evidence other than the contested coconspirator's statements.[3] The contested testimony of Csopey merely reinforces the credibility of circumstantial evidence already sufficient to hold defendants liable.

■ It is not necessary to charge a conspiracy in the complaint in order to invoke the coconspirator exclusion from the hearsay rule. *United States v. Doulin,* 538 F.2d 466, 471 (2d Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178 (1976); *see United States v. Clark,* 613 F.2d 391, 402–04 (2d Cir.1979) (even if acquitted on the conspiracy count, coconspirator's statements may be admissible on the substantive count), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). Charging a substantive violation is sufficient. *United States v. Branker,* 418 F.2d 378, 380 (2d Cir.1969). When conspiracy is not charged, however, participants in the conspiracy often are referred to instead as "joint venturers," *see Clark,* at 404, or as "acting in concert," *see* 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(E)[01], at 801–230 & n. 5 (1985), and that language appears to be apposite herein.

In determining whether the prosecution has proved by a preponderance of the evidence the existence of a "joint venture" and the defendants' participation in it, "pieces of evidence must be viewed not in isolation but in conjunction." *Geaney,* 417 F.2d at 1121. Further, " 'each of the episodes gain[s] color from each of the others.' " *United States v. Sliker,* 751 F.2d 477, 494 (2d Cir.1984) (quoting *United States v. Monica,* 295 F.2d 400, 401 (2d Cir.1961), *cert. denied,* 368 U.S. 953, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962)), *cert. denied sub nom., Buchwald v. United*

noted by commentators, *i.e.*, whether the coconspirator's statements must be shown to be independently reliable before being admitted. *Inadi,* 106 S.Ct. at 1124 n. 3 ("The reliability of the out-of-court statements is not at issue in this case."). *Compare United States v. Perez,* 702 F.2d 33, 37 (2d Cir.) (indicating that an independent reliability determination must be made but stating that a declaration in furtherance of the conspiracy will often be sufficient to demonstrate reliability), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1336 (1983) *with United States v. Aboumoussallem,* 726 F.2d 906, 910 (2d Cir.1984) ("*Even if* we were to require some indicia of reliability beyond the circumstance of a co-conspirator's making a report that furthers a conspiracy ...") (emphasis added). Whatever the eventual resolution of this Confrontation Clause concern may be for criminal cases, in a civil case, where Confrontation Clause concerns are not present, no independent reliability determination is required.

2. This dilemma does not occur in criminal cases because of the difference in the quantum of proof necessary for conviction, *i.e.*, proof beyond a reasonable doubt, and for admission of the coconspirator's statement, *i.e.*, preponderance of the evidence.

3. Of course, had the independent evidence of the conspiracy not met the preponderance standard, this Court could use the adverse inference drawn from Tome's assertion of his Fifth Amendment privilege as a factor to consider on the SEC's burden of proof as to the conspiracy's existence and as to the conspiracy's participants.

*States,* — U.S. —, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985).

■ Unquestionably, Tome and Leati were engaged in a joint venture to illegally trade on inside information concerning Seagram's unannounced bid for control of St. Joe. Without regard to the contested portions of Csopey's testimony, the evidence—particularly Bronfman's testimony, the BSI employees' affidavits, and Tome's trading activity—convincingly demonstrates that Tome misappropriated confidential nonpublic information regarding Seagram's acquisition plans and traded on it for his own benefit.

Tome also engaged in a joint venture with Leati to exploit this nonpublic information that Tome possessed. The personal relationship between Tome and Leati and, consequently, the close business relationship between Finvest Geneva and Lombardfin S.p.A. provided fertile ground for this illicit conduct. Leati had known Tome for years, even before Leati went into brokerage. As detailed in the accompanying Opinion in this case, at 8–9, because of this personal relationship, Tome's Finvest Group, particularly Finvest Geneva, had close business ties to Lombardfin S.p.A.; Lombardfin S.p.A.'s two principal foreign affiliates were renting their *only* office space, if it could be called that, from Finvest Geneva; Tome regularly visited Lombardfin S.p.A.'s domestic subsidiary's offices and used its facilities to conduct his business; a 100% owned Lombardfin S.p.A. affiliate executed Eurobond trades on Finvest Geneva's behalf because Finvest Geneva did not have the capacity to clear trades; Finvest Geneva had a securities trading account with a 100% owned Lombardfin S.p.A. affiliate.

Against this backdrop of interaction and familiarity, the joint venture flowered. After his telephone conversation with Bronfman on March 9, Tome on March 10 began his frantic trading and tipping to overseas clients and associates.[4]

By the end of the day, Leati, acting on his discretionary authority, had purchased for Lombardfin S.p.A.'s clients, over 40,000 St. Joe shares, despite the fact that before March 10, 1981, Lombardfin S.p.A. had not traded even one single share of St. Joe stock. Leati's futile attempt to justify such enormous trading on a stock he had never previously traded, with Leati's trading beginning *two minutes* after speaking to Tome, by claiming that he engaged in some sort of independent analysis of the stock only adds an additional inference to the already overwhelming circumstantial evidence that Tome and Leati were engaged in an illicit joint venture to profit from the inside information Tome possessed concerning Seagram's plans to make a tender offer for St. Joe.

The statements Leati made to Csopey concerning the contents of Leati's conversations with Tome were made during the course of and in furtherance of the joint venture. Leati spoke to Csopey, Leati's partner in and co-founder of Lombardfin S.p.A., privately, in Leati's office, on the afternoon of March 10th, after speaking to Tome on the phone. While the outer temporal boundaries of a conspiracy's existence are often subject to debate, this conversation between Leati and Csopey took place right after this newly-formed illicit joint venture between Tome and Leati. Unquestionably, the contested statements took place during the course of the conspiracy. Leati made additional purchases of St. Joe securities for Lombardfin S.p.A.'s clients after the conversation with Csopey. Given the evidence in this case, it appears that the illicit association continued at least through the time that Tome was anticipating the recompense of $200,000 mentioned by Csopey (but denied by Leati) for the inside information Tome supplied to Leati for Lombardfin S.p.A.'s clients.

The statements Leati made to Csopey were also in furtherance of the illicit venture; they were intended to bring Leati's partner (who owned 12.5% of Lombardfin

---

**4.** Tome's hotel only registered outgoing calls, and took messages if Tome was not in; no hotel records are kept of incoming calls if Tome was in to receive the call or if no message was left.

S.p.A.'s stock) up-to-date on the significant news that had occurred while Csopey was out in the field visiting clients and to solicit his partner's ratification of the prior St. Joe transactions and approval for further purchases. After recounting the discussions between himself and Tome, and discussing the possible accuracy of Tome's information in light of Tome's confidential position as a Seagram advisor, Leati suggested even further purchases of St. Joe securities, saying "Let's give it a try."

In these circumstances, Leati's disclosures to Csopey were clearly in furtherance of the illicit association between Tome and Leati.

Csopey's testimony concerning what Leati told him about conversations between Tome and Leati is therefore admissible as "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Rule 801(d)(2)(E), Fed.R.Evid.

### 2. *Defendants' Objections To Bronfman's Testimony*

■ Defendants objected to three isolated statements in Bronfman's deposition on relevancy, materiality, and competency grounds. These objections are overruled. The Bronfman deposition, in its entirety, is admissible. Defendants objections are discussed below seriatim, with the underscored portion of the deposition testimony being the portion objected to:

Bronfman Transcript pages 14–15:

Q: Other than the two matters that you mentioned to us earlier, that is to advise on currency and to invest the 10 million dollars on behalf of Seagram, was there any other business or economic relationship between Mr. Tome and Seagram or any of its affiliates that you're aware of?

A: Well, Tome is also a friend of mine, and we see each other a great deal socially and naturally we see each other socially and we talk about a lot of things in a business nature. And I consider him sort of a European consultant to Seagram generally. It's not a formal relationship.

■ Defendants object to the underscored portion of the testimony on the grounds that it is inappropriate opinion testimony by Bronfman and is inadmissible to prove that Tome was in fact a European consultant to Seagram. The relationship between Tome on the one hand and Bronfman and Seagram on the other, however, goes to the heart of this controversy. Bronfman's, and thus Seagram's, view of the employment and relationship with Tome, and the information disclosed within the parameters of that relationship, is extremely relevant and admissible to determine whether Bronfman and Seagram had an expectation that Tome would keep nonpublic information disclosed to him within the confines of the fiduciary or similar relationship confidential. *Dirks v. SEC*, 463 U.S. 646, 655 n.14, 103 S.Ct. 3255, 3262 n. 14, 77 L.Ed.2d 911 (1983). Moreover, Bronfman, as Chairman of the Board and Chief Executive Officer of Seagram, had substantial control over the amount of confidential information disclosed to Tome. Bronfman's understanding of his (and Seagram's) relationship with Tome is therefore helpful in determining the scope of Tome's access to confidential information.

Bronfman Transcript pages 49–50

Q. In connection with this discussion, did you say in words or substance to Mr. Tome that the information you were discussing with him was confidential?

A. No. I didn't think that was necessary.

Q. Because?

A. Management 20 years in this business. He ought to know the rules. I assume he does know the rules.

■ Defendants object to the underscored portions of the testimony on the grounds that Bronfman cannot testify as to the state of mind of Tome, nor as to what Tome understood his relationship with Seagram and Bronfman to be, since there is no evidence in this passage that Bronfman communicated his confidentiality concerns to Tome. This argument is a spurious one for several reasons. There is direct evidence emanating from Tome that he com-

municated to Bronfman his understanding that the information Bronfman confided to Tome, solely for the corporate purposes of Seagram, was to be kept confidential. After this suit was filed by the SEC, naming Unknown Purchasers in Switzerland as having engaged in these illegal St. Joe transactions, Bronfman called Tome to make sure he was not involved in the St. Joe trades. Tome responded to Bronfman's inquiry by stating:

> You know, I've been in this business [*i.e.*, securities] for 20 years and I know what to do and what not to do. And clearly I certainly didn't do anything.

In addition, the relationship between the management of a corporation and its financial advisors and consultants regarding prospective hostile tender offers is inherently one which implies a duty of confidentiality. *See Dirks*, 463 U.S. at 655 n. 14, 103 S.Ct. at 3262 n. 14. Moreover, Bronfman's (and therefore Seagram's) understanding of their relationship with Tome is of course relevant because it bears on the expectation of Seagram and Bronfman that the information confided to Tome would be kept confidential. *See id.*

Bronfman Transcript page 93

Q. Why did you call Mr. Tome?

A. I called him because the S.E.C. had initiated this suit and I was concerned that perhaps he had done something. I wanted to make doubly sure he hadn't. Because the only person I knew in Switzerland that would have any knowledge one way or another of anything that was going on, at least for me, was Mr. Tome.

Defendants object to the underscored portion of the testimony on the grounds that it is opinion testimony for which no proper foundation has been laid and that it is irrelevant to prove Tome's knowledge of Seagram's tender offer plans. These objections are overruled. The quoted passage explains Bronfman's motive for calling Tome in Switzerland as soon as Bronfman learned that the SEC had filed suit against Unknown Purchasers who purchased St. Joe securities through BSI, a Swiss bank.

It is highly relevant that Bronfman, the person calling the shots in Seagram's search for an acquisition and the person through whom Tome wangled his way into Seagram's affairs, picked up the phone after learning of the suit to ask Tome whether he had done anything improper with the information Bronfman had confided to him. Bronfman's act of telephoning Tome speaks louder than any words could.

3. *Defendants' Objections To Certain SEC Exhibits*

After trial, both sides submitted additional exhibits into evidence and opposing counsel for each side objected to the other's offer. The SEC's objections to defendants' exhibits are overruled and all exhibits offered by defendants, both at and after trial, are received in evidence and have been reviewed.

■ The SEC submitted certain exhibits after trial to which the defendants offered only generalized objection.[5] One of the objections was that the exhibits (as was other information) were furnished after the Court sessions and while matters that were anticipated but had not been lodged with the Court were forthcoming. In response to the objection, the Court advised defendants' counsel that permission had been granted to supply the data, that exhibits 700, 907, 908, 909, and 913 bore on the issues or contained matter not reasonably controvertible and that "If you or Mr. Schachner have any *specific* objection to any *specific* portion of these enumerated exhibits, the Court will entertain them if received within five days of receipt of this letter." No specific objection was presented. These exhibits are received in evidence.

■ A further dispute arose as to the admissibility of certain trading records. Suffice it to say that the trading records of transactions so far as they refer to transactions in St. Joe call options or stock are received and those records referring to other stocks or transactions in other stocks or

---

5. Exhibits 900, 901, 902, 903, 904, 905, and 906

were received in evidence without objection.

638

options are excluded. Such records of St. Joe items were known to defendants well in advance of trial, data therefrom was incorporated in the agreed findings of fact, and compilations thereof may be received appropriately in evidence under Rules 803(6), (8), (17), and (24), Fed.R.Evid. The remaining exhibits offered by the SEC post-trial are excluded.

So Ordered.