SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff–Appellee,

v.

Giuseppe B. TOME, Paolo Mario Leati,
Lombardfin S.p.A., Trasatlantic Finan-
cial Co., S.A., Nayarit Investments, S.A.,
Finvest Underwriters and Dealers
Corp., Certain Purchasers of the Com-
mon Stock and Call Options for the
Common Stock of St. Joe Minerals
Corp., and Banca Della Svizzera Italia-
na, Defendants,

Paolo Mario Leati, Lombardfin S.p.A.,
Trasatlantic Financial Co., S.A., Nayar-
it Investments, S.A., and Finvest Under-
writers and Dealers, Defendants–Appel-
lants.

Nos. 1098, 1099, Dockets 86–6192(L),
86–6194, 86–6196.

United States Court of Appeals,
Second Circuit.

Argued April 10, 1987.

Decided Nov. 20, 1987.

Richard A. Kirby, Asst. Gen. Counsel, S.E.C., Washington, D.C. (Paul Gonson, Sol., Daniel L. Goelzer, General Counsel, Jacob H. Stillman, Associate General Counsel, Thomas L. Riesenberg, Sp. Counsel, Martha H. McNeely, Katharine B. Gresham, Randall W. Quinn, Attys., S.E.C., Washington, D.C., of counsel), for plaintiff-appellee.

Paul J. Bschorr, New York City (White & Case, New York City, Robert M. Kelly, Dorothea W. Regal, Loreto Ruzzo, Barbara Shea, of counsel), for defendants-appellants Lombardfin S.p.A. and Paolo Mario Leati.

Bruno Schachner, New York City, for defendants-appellants Nayarit Investments, S.A., Trasatlantic Financial Co., S.A., Finvest Underwriters and Dealers Corp.

Before LUMBARD, OAKES and CARDAMONE, Circuit Judges.

LUMBARD, Circuit Judge:

On March 10, 1981, one day before Joseph E. Seagram & Co. ("Seagram") announced a hostile tender offer for St. Joe Minerals Corporation ("St. Joe"), Giuseppe B. Tome and his associates ordered massive purchases of St. Joe securities. Less than three weeks later, the SEC filed this suit originally charging Banca Della Svizzera Italiana ("BSI"), Irving Trust Company and "certain purchasers of call options for the common stock of St. Joe Minerals Corporation" with violations of the anti-fraud provisions of the federal securities laws. The complaint was amended on several occasions and ultimately named Tome, three

Panamanian corporations in which he owned a beneficial interest (Trasatlantic Financial Co., S.A., Nayarit Investments, S.A., and Finvest Underwriters and Dealers Corp. (collectively the "Panamanian corporations" or "Panamanian defendants")), the "certain purchasers", Paolo Mario Leati, Lombardfin, S.p.A. and BSI as defendants.

After a bench trial on October 23, 1985, in the Southern District of New York, Judge Milton Pollack found that the defendants had violated sections 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(e) and Rules 10b–5 and 14e–3. *SEC v. Tome*, 638 F.Supp. 596 (S.D.N.Y.1986). By a judgment entered on July 22, 1986, 638 F.Supp. 638, Judge Pollack enjoined the defendants from violating the antifraud provisions of the federal securities laws and ordered them to disgorge over $2.7 million in profits obtained through trading on nonpublic information (plus over $1.3 million in prejudgment interest). The Panamanian corporations [1] and Leati and Lombardfin appeal from that judgment.

Leati and Lombardfin claim that the district court lacked personal jurisdiction over them because of defects in the service of process. The Panamanian corporations join them in making three additional arguments: (1) they challenge the admissibility of the deposition testimony of Dionisio G. Csopey; (2) they attack the sufficiency of the evidence; and (3) they contend that the district court improperly ordered disgorgement of their profits. We affirm.

We summarize the salient facts, more fully recorded in the district court's opinion. The case of the Securities and Exchange Commission focused on Giuseppe B. Tome, an Italian national now residing in Switzerland. Tome began working as a registered representative in the securities industry at the Milan office of Bache & Co. in 1959. He moved to E.F. Hutton & Company, Inc. where he eventually became

---

1. On November 25, 1986, we granted the SEC's motion to dismiss Tome's appeal because he was, and still is, a "fugitive from justice," but denied the same motion as to the Panamanian defendants. We deny the SEC's request to reconsider the denial of its motion to dismiss the appeal of the Panamanian defendants.

president of E.F. Hutton, International, S.A., and a director of E.F. Hutton & Company, Inc. In 1979, Tome resigned from Hutton and formed his own investment company, Compagnie Pour le Financement et l'Investissement, S.A. (Finvest Geneva) in Geneva, Switzerland. Tome is also a beneficial owner of the defendant Panamanian corporations. In March 1981, when the illegal transactions took place, he enjoyed discretionary power over their accounts at BSI, a Swiss bank based in Lugano, Switzerland.

Paolo Mario Leati is a sales representative and Lombardfin is a broker/dealer both of whom are registered with the SEC. In 1974, Leati, an Italian national living in Italy, and Dionisio G. Csopey left Merrill Lynch, Pierce, Fenner & Smith, Inc. and formed Lombardfin, S.p.A., a holding company whose subsidiaries and affiliates engage in securities and currency brokerage. Leati—the majority shareholder of and primary decisionmaker for Lombardfin—wielded discretionary authority over many of his clients' accounts. Finvest Geneva and Lombardfin, and consequently Tome and Leati, enjoyed a close working relationship evinced by office rental agreements, brokerage contacts, and other business arrangements.

In July, 1980, Tome met Edgar M. Bronfman, Chairman of the Board and Chief Executive Officer of Seagram, when the two flew on the Seagram company plane to a rodeo in Cheyenne, Wyoming. Tome subsequently developed a business relationship with Bronfman and in October, 1980, Tome, acting for Finvest Geneva, agreed to provide Seagram with information and advice about foreign currencies. In the same month, Finvest Geneva agreed to invest and manage ten million dollars for Seagram in various currencies, bonds and notes. Bronfman also opened a personal account at Finvest Geneva, over which he gave Tome discretionary authority.

In August, 1980, Seagram sold its interest in Texas Pacific Oil Company for $2.3 billion. With this cash reserve and a $3 billion line of credit, Seagram began looking for an acquisition candidate. Because of Bronfman's interest in coal as a primary energy source, Seagram focused on companies with significant coal assets, particularly Santa Fe Industries, Amax, St. Joe, and Union Pacific. In late 1980, Tome requested and received from Seagram a briefing on its policies, operations, and financials.

In making acquisition decisions, Bronfman "consider(ed Tome) sort of a European consultant to Seagram generally," 638 F.Supp. at 603, and looked to him for insight into how the European investment community would view an acquisition by Seagram. "Tome seized and actively solicited and nurtured this confidentiality, frequently probing into the internal reasons for Seagram's actions, asking Bronfman 'why?'" 638 F.Supp. at 603. In mid–December, 1980, Bronfman informed Tome that Seagram was looking "very hard" at Santa Fe and sought Tome's advice on the proposed acquisition. This conversation indicated to Judge Pollack that "Tome was looked upon and treated by Bronfman as an insider of Seagram, as he had become." *Id.* at 604. Tome probed why Seagram was interested in Santa Fe and when Bronfman expected to act. Bronfman testified that he and Tome "didn't just discuss Santa Fe, but companies like Santa Fe," and that he might even have mentioned Seagram's short list of potential acquisition candidates —Santa Fe, Amax, and St. Joe.

On January 13, 1981, the board of Seagram's parent corporation authorized Seagram to invest up to $150 million in the stock of four companies, without being informed that the companies were Santa Fe, Amax, St. Joe, and Kimberly Clark. On January 28, Seagram decided not to proceed with the acquisition of Santa Fe. Bronfman conveyed this information to Tome by February 6, at the latest. In early February, Seagram also dropped Amax from the potential acquisition list. Bronfman could not remember whether he informed Tome that Amax had been removed from Seagram's acquisition list. According to Bronfman, "[a]lmost by a process of elimination, that left St. Joe." By February 25, 1981, Bronfman had decided to make a tender offer for St. Joe.

The price and volume of St. Joe securities trading remained relatively stable during February and March. Moreover, two weeks prior to Seagram's tender offer, Salomon Brothers & Co., a highly respected New York broker-dealer, executed sales of a large block of St. Joe stock on behalf of an institutional client. Apparently, Seagram's intentions were a well-kept secret.

Bronfman and Tome continued to see each other socially: They participated in a "joint venture" as investors in the Broadway musical "Sophisticated Ladies;" Bronfman, Tome and their wives spent vacations together in France, Virginia, and Mexico; and they talked frequently by telephone. On March 9, 1981, Tome called Bronfman in New York and invited him to dinner the following evening. Bronfman declined Tome's dinner invitation, stating that he would be in Montreal for a directors' meeting.

The next morning, March 10, 1981, Tome feverishly placed orders for St. Joe securities. Through BSI, Tome purchased 1,055 options [2] on St. Joe common stock on behalf of the Panamanian corporations. Tome bought an additional 3,000 shares of St. Joe stock through Finvest Geneva on behalf of Finvest Underwriters and Dealers Corp. Tome later sold 2,000 of these shares, reaping an overnight profit of $34,000 and exchanged the other 1,000 shares of St. Joe stock for 1,200 shares of Fluor Corporation. The trading profits were deposited in BSI's account at Irving Trust. On the morning of March 11, Seagram's public announcement of the tender offer foiled Tome's efforts to place orders for an additional 2,055 call options.

Tome also made numerous phone calls on March 10 to individuals at various foreign financial institutions urging them to purchase St. Joe securities. After telephone calls from Tome, Banque de Rone, a Swiss bank in Geneva, purchased 200 St. Joe shares and 50 St. Joe call options; Cramer, a Swiss bank client, bought 100 St. Joe call options and 1,000 St. Joe shares; and Compagnie de Banque et d'Investissements, another Swiss bank client, placed orders for 150 St. Joe call options and 1,100 shares. On the same day, Banque Gutzwiller and Trade Development Bank (TDB), both clients of Tome, bought 2,000 and 13,000 St. Joe shares respectively. Although Gutzwiller and TDB never received phone calls from Tome, the district court concluded that "Tome conveyed the inside information that he possessed to Gutzwiller and to TDB, and that they subsequently traded and profited personally on that information." 638 F.Supp. at 610.

Tome also called Leati in Milan on March 10. Two minutes after hanging up, Leati exercised his discretionary authority over his clients' accounts and began purchasing St. Joe securities. Before March 10, Lombardfin had never purchased or sold a single share of St. Joe. By the end of the day, Lombardfin had purchased 40,200 shares of St. Joe common stock and 500 St. Joe call options, which it subsequently liquidated for a net profit of $1,345,925.

According to Leati, Tome said only "I'd buy [St. Joe]" when he telephoned. However, Leati's partner, Dioniso Csopey, told a different story, which the district court credited. Csopey testified that on March 10, Leati mentioned that he had learned from Tome that Seagram would make a tender offer for St. Joe in a few days. Leati agreed to pay Tome $200,000 for this information, if a takeover in fact took place. Leati believed that Tome's claims "could well be true" because of Tome's close personal relationship to Seagram. With Csopey's assent, Leati placed additional orders for St. Joe securities on March 11, which were never executed because of the announcement of the tender offer. The next day Leati told the board of directors of Lombardfin of his agreement with Tome, admitted that Lombardfin had committed securities violations, but downplayed the risk of being caught.

Altogether, Tome and his confederates purchased call options on 185,500 shares of

---

**2.** Each option gives the purchaser the right to buy 100 shares of the underlying stock on terms provided in the option.

St. Joe stock, one-third of all such options traded at the Philadelphia Stock Exchange on March 10. The bulk of the options bought by Tome expired 11 days after they were purchased. They also bought at least 60,500 shares of St. Joe common, representing 10.67% of the total volume in St. Joe stock sold on the New York Stock Exchange on March 10.

At 7:00 p.m. on March 10, the board of directors of Seagram's parent company held a special meeting. The meeting had been scheduled for the following day, but it was changed because of activity in St. Joe stock. At that meeting, the parent company authorized Seagram to make a tender offer for St. Joe. At 9:22 a.m. the following morning, March 11, Seagram announced publicly its bid for St. Joe and its stock price soared.

In New York on the evening of March 11, Bronfman, Tome and their wives went to see "Sophisticated Ladies". Although they discussed Seagram's tender offer, Tome said nothing about his trading the previous day. That night Bronfman gave a dinner party for twenty people in Tome's honor. Again, the two discussed the tender offer and again Tome failed to mention his dealings in St. Joe securities. On March 12, Tome liquidated his St. Joe holdings and instructed his clients to do the same.

On March 13, the SEC publicly announced an inquiry into possible insider trading on the Seagram offer for St. Joe stock. Tome left New York and returned to Switzerland on March 14. The following day, Tome called BSI and asked them to rearrange the option purchases to make it appear that Finvest Underwriters had not purchased any St. Joe options. BSI refused.

The SEC commenced suit on Friday, March 27, 1981. The complaint named BSI and Irving Trust Company of New York, where the proceeds of BSI's trading in St. Joe had been deposited, as nominal defend-

ants. The remaining defendants were identified by category as "certain purchasers" of St. Joe call options. The district court ordered frozen BSI's account at Irving.[3]

The following Monday, March 30, Bronfman learned about the SEC investigation of alleged insider trading in St. Joe securities originating in Switzerland; he immediately phoned Tome. According to Bronfman, Tome was "the only person I knew in Switzerland that would have any knowledge one way or another of anything that was going on." At about 7:20 that night, Tome returned his call and denied any wrongdoing, but admitted that the matter was "a little more complicated than that." He promised to elucidate when he saw Bronfman in New York the following week.

On Monday, April 6, Tome visited Bronfman at his New York apartment. Tome acknowledged that one of his people had placed an order for 3,000 shares of St. Joe stock but claimed that he had not been personally involved. When Bronfman asked point blank, "Were those shares in any way beneficially owned by you or members of your family?" Tome responded, "No." Tome repeated his story the following morning in Bronfman's office, with Bronfman's attorney present. Judge Pollack noted that later "Tome's counsel conceded on the record that Tome had a beneficial interest in St. Joe stock purchases." 638 F.2d at 613 (footnote omitted).

Tome left the United States soon thereafter, missing a business meeting on April 9. He has not returned to the United States since 1981, and has refused to appear in this action or related criminal proceedings.

## I. SERVICE OF PROCESS

Leati and Lombardfin contend that the district court did not have personal jurisdiction over them because they never received valid service of process. When the SEC instituted this suit on March 27, 1981, it

---

3. On November 18, 1986, BSI satisfied the district court's judgment, which ordered it to pay into the registry of the court $2 million—most of the Panamanian corporations' illegal profits plus interest. BSI has not appealed from that judgment and the Panamanian defendants lack standing to appeal in BSI's stead.

was aware only that a substantial number of the March 10th trades in St. Joe securities had been conducted through BSI. Swiss bank secrecy laws prevented the SEC from ascertaining the identities of the individual purchasers involved. Therefore, the original complaint named only BSI, Irving Trust (where BSI had deposited the proceeds of the trades) and "Certain Purchasers of Call Options for the Common Stock of St. Joe Minerals Corporation" as defendants. These purchasers were defined in the complaint as "certain persons, the identities and addresses of whom are unknown to the plaintiff at this time." On November 12, 1981, BSI, facing contempt sanctions, informed the SEC that Tome and the Panamanian defendants had ordered purchases of St. Joe securities during the period in question. The SEC amended the complaint on December 14, 1981 to include Tome and the Panamanian corporations as defendants.

During its subsequent investigation of Tome's involvement, the SEC learned that on March 10, 1981, Tome had telephoned several foreign financial institutions, including Lombardfin, and that these institutions had purchased St. Joe securities immediately after these telephone conversations took place. Leati submitted an affidavit to the SEC[4] taken in Milan dated April 28, 1982, in which he admitted that he purchased St. Joe securities on March 10, 1981 through Lombardfin but denied knowingly trading on nonpublic information. He also submitted his records of those trades to the SEC. The Lombardfin trading records indicated that the St. Joe transactions were "unsolicited"—in other words, that the trades were executed without use of Leati's discretionary authority over the accounts. Unbeknownst to the SEC at that time, the information contained in the Leati affidavit and the Lombardfin records was false.

The SEC filed a second amended complaint on May 13, 1982, which expanded the category of "certain purchasers" to include persons, whose identities were unknown to the SEC and who had effected transactions in St. Joe securities through a number of foreign banks and securities dealers, including Lombardfin. At this point the SEC had no evidence suggesting that Leati and Lombardfin had knowingly participated in illegal trades, therefore, they were not named as defendants in the second amended complaint.

The record reflects the many difficulties that the SEC experienced in attempting to serve process on Tome and the Panamanian defendants. Due to these difficulties and because the identities of the other purchasers remained unknown despite diligent efforts, the SEC sought an order pursuant to Fed.R.Civ.P. 4(i)(1)(E) (which allows service on a foreign defendant "as directed by order of the court") authorizing service on all defendants by publication of the complaint and summons in the *International Herald Tribune* and *La Suisse*. Judge Pollack granted the motion by order on May 13, 1982. The *International Herald Tribune* is an English language paper which is widely read by the international financial community in Europe; *La Suisse* is a French language paper circulated in and around Geneva. When it was discovered that publishing the complaint and summons in *La Suisse* would violate Swiss law, the order was amended and the complaint and summons were published in all editions of the *International Herald Tribune* for four successive weeks.

On September 4, 1985, the SEC deposed Dionisio Csopey, Leati's former partner, pursuant to a subpoena in New York. Csopey's deposition testimony revealed that the affidavit and trading records submitted by Leati to the SEC were misleading. According to Csopey, when Tome called Leati on March 10, he told Leati that "Seagrams would make, in the next few days, make a tender offer for St. Joe Minerals." 638 F.Supp. at 615. Leati told Csopey that Tome was passing this information on to Lombardfin in exchange for $200,000, if the tender offer in fact occurred. Csopey also testified that during a Lombardfin

**4.** The record does not show the circumstances under which the affidavit was submitted.

board of directors' meeting on March 11, 1981, Leati explained the circumstances surrounding the St. Joe transactions and admitted that the firm had committed securities violations by trading on inside information. However, he "downplayed the risk of being caught by remarking that Lombardfin S.p.A. had accounted for only a 'small fraction' of the previous day's total trading volume." *Id.* at 616.

During Letter Rogatory proceedings (authorized by the district court in September 1985) in Milan, Italy on October 2, 1985, Leati for the first time admitted that some of the trades he executed on March 10, 1981 involving St. Joe securities were not "unsolicited" and that Tome had told him to buy St. Joe. The testimony at the Letter Rogatory proceedings and the Csopey deposition testimony established that Leati was involved in the insider trading scheme with Tome. The SEC then sought to amend the second amended complaint to identify Leati and Lombardfin by name as among the group referred to as "certain purchasers" on the face of the complaint. This amendment made no changes in the allegations contained in the body of the complaint. On October 17, 1985, the district court issued an "Order to Show Cause Why Leave to Amend ... Complaint in respect of the 'Purchasers' and to substitute therefor in part the names of ... [Leati] and Lombardfin ... should not be granted." The order required Leati and Lombardfin to show cause at the United States Courthouse at 10:00 a.m. on October 23rd, "or as soon thereafter as counsel can be heard." On October 18, a member of the Italian bar personally delivered the order on behalf of the SEC to Leati and Lombardfin at their office in Milan.[5] At the commencement of the trial on October

23, 1985, Judge Pollack heard the SEC's motion to amend the complaint to identify Leati and Lombardfin as two of the "certain purchasers" named as defendants. Leati and Lombardfin elected not to appear at either the hearing or the trial. Judge Pollack found that the 1982 service by publication coupled with the evidence that Leati and Lombardfin "clearly were aware of the pendency of this litigation but chose not to participate in it" satisfied the notice and service requirements and concluded that because Leati and Lombardfin had already been charged as unknown defendants in 1982, substitution of their names on the complaint was not a substantive amendment requiring reservice of the complaint. On July 22, 1986, the district court entered judgment holding Leati and Lombardfin liable for violations of the anti-fraud provisions of the securities laws. Leati and Lombardfin now challenge the district court's jurisdiction. We reject their challenge.

To submit a party to the jurisdiction of a court, due process has long been held to require the giving of notice in such a manner that there can be little doubt that the party has actual notice of the claims in order to appear and defend. *Wuchter v. Pizzutti*, 276 U.S. 13, 24, 48 S.Ct. 259, 262, 72 L.Ed. 446 (1928). Where the plaintiff can show that deliberate avoidance and obstruction by the defendants have made the giving of notice impossible, statutes and caselaw have allowed substitute notice by mail and by publication in media of general and wide circulation. Thus, as business dealings have become increasingly interstate and international, the means of giving notice have been extended to meet these situations, so that parties may be held accountable in our courts of justice.

---

5. Francesco Abbozzo handed envelopes containing the order to show cause, the affidavit in support of the order, and the memorandum in support of the application for the order and leave to amend the complaint to Leati at 12:45 p.m. on October 18 in Milan. The same documents were also delivered to Leati's and Lombardfin's attorney at 12:50 p.m. Several pages of the affidavit and memorandum were missing due to transatlantic transmission problems. Abbozzo informed Leati of the omissions and indicated that he would return with the missing pages. At approximately 4:45 p.m., Abbozzo delivered complete copies of the documents to a secretary at Lombardfin. Leati then emerged from an office and ejected him from the premises. Complete copies were also delivered to Leati's counsel the same day.

Gradually we have come to permit and approve the giving of notice under a substitute system limited by the requirements of the due process clause. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Publication of the complaint and summons in the *International Herald Tribune* was "reasonably calculated" to notify the unidentified purchasers of St. Joe options, including Leati and Lombardfin, of the suit against them. The SEC was aware that the illegal trades had been effected through several European financial institutions, yet its efforts to identify the guilty parties were thwarted by Swiss secrecy and other foreign laws. The SEC reasonably concluded that the purchasers resided or conducted business in Europe and chose a publication likely to be read by international investors. The propriety of this method of notice must also be considered in light of the fact that members of the securities industry like Leati and Lombardfin may be expected to be aware of a publicly announced SEC investigation involving insider trading during a highvisibility takeover. The facts here are distinguishable from cases where notice was published in a small regional paper or the advertisement contained nothing which would draw a party's attention to it. *E.g., Mullane,* 339 U.S. at 315, 70 S.Ct. at 657. Notice by publication, in the circumstances surrounding this action, was reasonably calculated to apprise the interested parties of the lawsuit.

The "reasonably calculated" analysis need not be relied on exclusively in this case because we are not dealing with the question of the adequacy of *constructive notice.* There can be no doubt that by October 23, 1985 when the matter was tried before Judge Pollack, Leati and Lombardfin knew of the suit brought by the SEC and the claims against them.[6] In fact, they were cognizant of the action years before the SEC discovered evidence of their involvement. As a registered representative, Leati realized on March 10, 1981 that he was committing a serious violation of the United States securities laws by trading on inside information. The next day he explained to the Lombardfin board of directors that the St. Joe trades were illegal, but downplayed the risk of being caught. Tome visited the Lombardfin offices regularly throughout 1981. During this time, he and Csopey had discussions about the size of the legal fees for all involved in this action. Leati told Csopey that Tome had pressed him "for contributions to the legal fees and to a pool which would settle the case." 638 F.Supp. at 616. Leati's submission to the SEC of a false affidavit of April 28, 1982 and misleading trading reports designed to obscure his involvement in the illegal transactions provide further evidence that he was fully aware that he was among those referred to as "certain purchasers" on the face of the complaint and that he understood the nature of the suit and the charges against him. Prior to obtaining the information from the Csopey deposition and the Letter Rogatory proceedings, the SEC sought the cooperation of Leati and Lombardfin to determine the circumstances of the trades and the persons involved. Leati and Lombardfin declined to cooperate and Lombardfin's legal counsel refused to accept service of an SEC investigative subpoena. Leati and Lombardfin also petitioned the Italian court in August of 1985 to set aside the district court's Letter Rogatory and refused to produce any documents thereby requested. On October 18, 1985, five days before trial was to begin, Leati was personally served

---

6. The SEC moved to supplement the record on appeal, or, in the alternative, to remand to the district court, in order to produce evidence that Leati and Lombardfin took notice of the complaint and summons published in the *International Herald Tribune.* In view of our finding that Leati and Lombardfin received proper notice, we deny the motion.

with a copy of the order to show cause why he and Lombardfin should not be named as defendants in this case. With full knowledge of the pendency of the action against them, Leati and Lombardfin elected not to appear. They raise their objections for the first time in this appeal.

 Leati and Lombardfin claim that because the SEC admittedly knew their names and addresses when notice was published in the *International Herald Tribune,* such service was invalid. *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 800, 103 S.Ct. 2706, 2712, 77 L.Ed.2d 180 (1983); *Mullane,* 339 U.S. at 320, 70 S.Ct. at 660. Certainly, if a defendant's name and address are known or may be obtained with reasonable diligence, service by publication will not satisfy the requirements of due process. *Mennonite Bd. of Missions,* 462 U.S. at 800, 103 S.Ct. at 2712. However, this is not such a case. Although Leati and Lombardfin were well aware that they were among those named on the complaint as "certain purchasers" in this action, the SEC was not. Leati's affidavit and the misleading trading records deceived the Commission into believing that they were not involved in Tome's scheme. The SEC was unaware of the the nature of their involvement until September of 1985. Thus, at the time that Judge Pollack authorized service on the "purchasers" by publication, Leati and Lombardfin were "unknown defendants" whose identities could not have been ascertained with reasonable diligence by the SEC. *Id.* As the Supreme Court pointed out in *Mullane,* "in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." *Mullane,* 339 U.S. at 317, 70 S.Ct. at 658.

"The fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). This record clearly establishes that Leati and Lombardfin were afforded such an opportunity and that they made a conscious decision to ignore this action until after a judgment had been rendered against them.

## II. ADMISSIBILITY OF CSOPEY'S TESTIMONY

 All appellants challenge the admissibility of the deposition testimony of Dioniso G. Csopey, Leati's former partner at Lombardfin, which was introduced into evidence at trial in lieu of his appearance. The district court admitted Csopey's testimony, over objection, under the co-conspirator exception to the hearsay rule. Fed.R. Evid. 801(d)(2)(E). *SEC v. Tome,* 638 F.Supp. 629 (S.D.N.Y.1986). The Panamanian defendants contend that the testimony is inadmissible because (1) there was no extrinsic proof of the existence of a conspiracy between Leati and Tome; (2) Leati's statements to Csopey were not made in furtherance of the conspiracy; and (3) there was no showing they were co-conspirators with Leati. We disagree.

First, there was ample evidence that Tome and Leati were co-conspirators. They had a close working relationship, and it was immediately after the phone call from Tome that Leati began placing large orders for St. Joe securities. Second, when Leati made the statement to Csopey, he was trying to convince Csopey to assist him in making additional St. Joe purchases on March 11, 1981. *Id.* at 636. The district court could reasonably conclude that Leati made the statements "in furtherance" of the conspiracy. *See United States v. Rahme,* 813 F.2d 31, 35–36 (2d Cir.1987). Third, because the Panamanians were Tome's alter egos, the district court properly treated them as co-conspirators.

 There is no merit to Leati and Lombardfin's contention that Csopey's testimony was inadmissible against them because they were not given notice of his deposition. As discussed above, in September 1985 when Csopey's deposition was taken, Leati and Lombardfin were aware of the

action and that they were among the category of purchasers named in the complaint. When they chose to ignore the action, they forfeited their right to attend Csopey's deposition and to object to its admission at trial. They may not make their objection for the first time on appeal. *See, e.g., United States v. Mangan,* 575 F.2d 32, 44 (2d Cir.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978). Csopey's deposition was taken under oath after notice was given to the named defendants. There is nothing in the record to suggest that Judge Pollack's decision to admit the testimony at trial was improper.

### III. SUFFICIENCY OF THE EVIDENCE

Defendants' claims of insufficient evidence are without merit. The SEC introduced overwhelming evidence that Tome traded on material nonpublic information in breach of his fiduciary duties to Seagram in violation of Rule 10b–5. Through his confidential relationship with Bronfman and Seagram, Tome was privy to information not yet made public; one day prior to the announcement of the takeover, and the morning after having a conversation with Bronfman, Tome began frantically trading in St. Joe securities and advised his clients and friends to do likewise; trading by Tome and his associates accounted for one-third of the activity in St. Joe call options on the Philadelphia Stock Exchange and 10% of the activity in St. Joe common stock on the New York Stock Exchange one day prior to the announcement of Seagram's tender offer; and Tome purchased one of the most speculative types of security available—call options due to expire in 11 days.

Finally, Tome went to great pains to cover-up his trading. He traded through BSI, a Swiss bank protected by Swiss secrecy laws, although he would have received a discount on brokerage fees had he dealt through Baird–Patrick & Co., Inc. where he was a registered representative. He repeatedly misled Bronfman about his

activity in St. Joe securities, and he fled the United States soon after this action began. Thus, Judge Pollack's findings were amply supported by the record.

We also agree with Judge Pollack that the evidence showed that Leati and Lombardfin knew that nonpublic information had been divulged to them in breach of a fiduciary duty. *Dirks v. SEC,* 463 U.S. 646, 660, 103 S.Ct. 3255, 3264, 77 L.Ed.2d 911 (1983). Csopey testified that Leati told him that he had agreed to pay Tome $200,-000 for information that Seagram was about to make a tender offer for St. Joe. Leati made the large purchases of St. Joe stock immediately after talking with Tome, indicating his belief in the reliability of Tome's information. He told Csopey that he believed that the information "could well be true" because of Tome's ties to Seagram. At a Lombardfin board meeting on March 11, Leati admitted that his trades in St. Joe securities on the previous day had "obviously" been "a violation" of the United States securities laws. And, after the SEC commenced this action, Leati attempted to deceive the Commission by submitting a false affidavit with doctored trading records.

Leati and Lombardfin also complain that there was insufficient evidence to support an injunction against them. Judge Pollack found that there was a likelihood of recurrence because Leati had intentionally misappropriated inside information, had shown no remorse for doing so, had attempted to mislead the SEC, and because Leati had the opportunity to repeat his conduct in the future because of his position as a registered securities sales representative. We agree. There was "positive proof of a reasonable likelihood that past wrongdoing [would] recur" necessary for an injunction. *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18 (2d Cir.1977); *see, e.g., SEC v. American Board of Trade, Inc.,* 751 F.2d 529, 537–38 (2d Cir.1984). An injunction also properly issued against Lombardfin which is dominated by Leati as its owner and manager.

## IV. DISGORGEMENT

■ The appellants claim that the district court erred in ordering disgorgement of the proceeds of the illegal trades. They contend that the disgorgement remedy's only purpose is to provide restitution for victims of the illegality. In *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90 (2d Cir.1978), Judge Friendly explained that "the primary purpose of disgorgement is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched." *Id.* at 102.[7] As the Sixth Circuit has recently stated in *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir.1985) "[o]nce the Commission has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement without inquiring whether, or to what extent, identifiable private parties have been damaged by [the] fraud." *Id.* Whether or not any investors may be entitled to money damages is immaterial. The paramount purpose of enforcing the prohibition against insider trading by ordering disgorgement is to make sure that wrongdoers will not profit from their wrongdoing. Tome and his satellites must therefore "disgorge a sum of money equal to all the illegal payments [they] received." *Id.*

The judgment of the district court is affirmed.

---

7. We do not believe the Supreme Court's passing reference to the restitutionary nature of the disgorgement remedy in *Tull v. United States,* — U.S. ——, 107 S.Ct. 1831, 1839, 95 L.Ed.2d 365 (1987), was meant to cast doubt on the propriety of disgorgement in cases such as this. *Tull* dealt not with the power of a district court to order disgorgement in securities fraud actions, but with the right to a jury trial in an action seeking civil penalties and injunctive relief under the Clean Water Act. However, *Tull* answers the Panamanian defendants' argument that they had a right to a jury trial; the Seventh Amendment right to a jury trial does not apply to the equitable actions for disgorgement. *Id.*