## UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

## Shane Bashir SUMAN and Monie Rahman, Defendants pro se.

### No. 07 Civ. 6625(WHP).

United States District Court,
S.D. New York.

Feb. 11, 2010.

Dean Michael Conway, Esq., Securities and Exchange Commission, Washington, DC, for Plaintiff.

Shane Suman and Monie Rahman, Toronto, ON, Canada, Defendants Pro Se.

## MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Plaintiff United States Securities and Exchange Commission (the "SEC") brings this enforcement action against Defendants *pro se* Shane Bashir Suman ("Suman") and Monie Rahman ("Rahman" and collectively "Defendants") for insider trading in violation of Sections 10(b) and 14(e), and Rules 10b–5 and 14e–3, of the Securities Exchange Act of 1934 (the "Exchange Act"). The SEC moves for summary judgment and seeks a permanent injunction barring Defendants from violating the securities laws, disgorgement and prejudgment interest, the imposition of joint and several liability, and a civil penalty as permitted by Section 21A of the Insider Trading and Securities Fraud Enforcement

Act, 15 U.S.C. § 78u-1. For the following reasons, the SEC's motion for summary judgment is granted.

### BACKGROUND

Suman and Rahman are husband and wife. During the relevant period, they maintained separate residences in Ontario, Canada and North Logan, Utah. (Plaintiff's Local Rule 56.1 Statement dated June 26, 2009 ("Pl. 56.1 Stmt.") ¶¶ 1, 2, 11.)

Beginning in 2004, Suman was an information technology ("IT") contractor for Ontario-based MDS Sciex, a scientific equipment manufacturer and division of MDS, Inc. (collectively "MDS"). (Pl. 56.1 Stmt. ¶¶ 11–12.) In December 2006, Suman became a full-time employee of MDS. (Pl. 56.1 Stmt. ¶¶ 11–13, 17.) His duties included servicing the IT needs of MDS executives, maintaining Blackberry communication devices, and recovering "lost" electronic documents. (Pl. 56.1 Stmt. ¶¶ 14–15; Index of Exhibits to SEC's Motion for Summary Judgment ("SEC Index") Ex. 13: Deposition of Paul B. Young dated Feb. 4, 2009 ("Young Dep.") at 36–38.) As "administrator" of the MDS email system, Suman could sort emails using a filter he controlled. (Pl. 56.1 Stmt. ¶¶ 15, 32–34; Young Dep. at 34.) Thus, Suman could maneuver through the email system and cover his tracks. (Pl. 56.1 Stmt. ¶ 34.)

Like every other MDS employee, Suman signed an "MDS Personal Pledge (Employee)" in which he agreed to maintain "the Company's reputation of integrity" and to be bound by the MDS Global Business Practice Standards. (Pl. 56.1 Stmt. ¶ 25; SEC Index Ex. 23: MDS Personal Pledge signed by Shane Suman ("Suman Pledge") dated Dec. 28, 2006.) Those standards specify that information about "[p]lanned business acquisitions" is confidential and not to be shared outside MDS. (Pl. 56.1 Stmt. ¶¶ 25–26; SEC Index Ex. 24: MDS Global Business Practice Standards dated Sept. 2005 ("MDS Standards") at 14.) The standards warn employees not to trade MDS stock if they are aware of "material non-public information," including "[n]ews of an acquisition or divestiture of a significant business division or subsidiary." (Pl. 56.1 Stmt. ¶ 26; MDS Standards at 30.) The trading restriction also applied to "shares of companies negotiating, competing, doing business or seeking to do business with MDS." (MDS Standards at 30.)

In late 2006, MDS sought to acquire Molecular Devices Corporation ("Molecular Devices"), a company trading on the NASDAQ National Market system, in New York, under the symbol "MDCC." (Pl. 56.1 Stmt. ¶¶ 19, 54, 59.) The contemplated acquisition was highly confidential and known only by the codename "Project Monument." (Pl. 56.1 Stmt. ¶¶ 20, 23, 28.) Despite the embargo on references to Molecular Devices, MDS's due diligence team (the "Due Diligence Team") exchanged emails with the terms "Molecular Devices" and "Project Monument" in the same message. (Pl. 56.1 Stmt. ¶ 29; Young Dep. at 77–80.)

In December 2006, Paul Young ("Young"), the head of MDS's IT department and a member of the Due Diligence Team, discussed with Suman whether MDS's email system could accommodate an "approximate [ ] doubling in size." (Pl. 56.1 Stmt. ¶ 30; Young Dep. at 24–25.) Such conversations were routine in connection with potential acquisitions. (Young Dep. at 25–26.)

On January 19, 2007, Dawn Penner ("Penner"), another Due Diligence Team member, sought Suman's help for her malfunctioning Blackberry. (Pl. 56.1 Stmt. ¶¶ 39–40.) Suman obtained Penner's password, gained access to all her emails—including those received from a secure online site known as an "e-data room"—and

worked alone on her Blackberry for several hours. (Pl. 56.1 Stmt. ¶¶ 40–41.) Some of Penner's secure emails identified Project Monument as the acquisition of Molecular Devices. (Pl. 56.1 Stmt. ¶ 41.)

On the morning of January 23, MDS communications consultant Sylvia Halligan ("Halligan") experienced computer problems and summoned Suman to her office. (Pl. 56.1 Stmt. ¶¶ 48–50; SEC Index Ex. 15: Deposition of Sylvia Halligan dated Feb. 5, 2009 ("Halligan Dep.") at 7–8.) Halligan had been drafting a statement for MDS President Andy Boorn announcing MDS's acquisition of Molecular Devices when she "lost" the document. (Pl. 56.1 Stmt. ¶¶ 42–44, 47–48.) Halligan told Suman the lost document was very important and that it was titled "Andy Monument Message." (Pl. 56.1 Stmt. ¶ 51; Halligan Dep. at 28.) Suman attempted to recover it. (Pl. 56.1 Stmt. ¶ 52.)

Later that day, Suman conducted several internet searches:

(a) At 1:59 p.m., Suman searched for "monument.inc" on the Yahoo and Google search engines;

(b) At 1:59 p.m., Suman browsed "monument-inc.com," a website about tombstones;

(c) At 2:03 p.m., Suman searched for "MDCC" on the Yahoo Finance website;

(d) At 2:05 p.m., Suman browsed to the Molecular Devices website and viewed the "About Us" and "Instruments Main" webpages on that site;

(e) At 6:57 p.m., Suman searched the Yahoo RSS news headlines for "mdcc"; and

(f) From 6:59 p.m. to 7:29 p.m., Suman searched again for "mdcc" on several Yahoo websites.

(Pl. 56.1 Stmt. ¶ 54; SEC Index Ex. 30: Expert Report of Steven L. Rogers dated Apr. 10, 2009 ("Rogers Report") at 25–26.) That evening, Suman made a one-hundred minute phone call to his wife in Utah. (Pl. 56.1 Stmt. ¶¶ 55–57; SEC Index Ex. 28: Suman Telephone Records at Bates No. MOL00417.)

At 9:34 a.m. Eastern Time the next morning, Suman and Rahman used Rahman's brokerage account at E*Trade Canada (the "Rahman E*Trade Account") to purchase common shares and options of Molecular Devices on securities exchanges in the United States. (PL 56.1 Stmt. ¶¶ 3, 59; SEC Index Ex. 29: Ontario Securities Commission Interview with Shane Suman dated Feb. 2, 2007 ("OSC Interview") at 13–14.) Neither Suman nor Rahman had ever traded in Molecular Devices securities prior to this time. (Pl. 56.1 Stmt. ¶¶ 58, 63; SEC Index Ex. 25; E*Trade Monthly Account Statement of Monie Rahman ("E*Trade Statements"), at Bates Nos. MOL04599–MOL04724.) Between Wednesday January 24 and Friday January 26, 2007, Suman and Rahman acquired 900 call option contracts [1] for the purchase of Molecular Devices stock on the Chicago Board Options Exchange. (Pl. 56.1 Stmt. ¶ 60; E*Trade Statements at Bates Nos. MOL04716–MOL04722.) Each option entitled Suman and Rahman to buy 100 equi-

---

**1.** A "call option contract" entitles a purchaser, in exchange for a premium, to buy a specified security or commodity at a specified price within a specified time period. Option contracts for securities expire on the Saturday that follows the third Friday of the month. Using call options as an alternative to investing in the underlying stock limits the risk of a price decline to the cost of the option while ensuring the benefit of a price increase. However, "a call investor does not have the choice of waiting out an unexpected downturn in the security price beyond the expiration date of the call." *See* C.J. Woelfel, *Encyclopedia of Banking & Finance* 871–72 (10th ed. 1994).

ty shares in Molecular Devices at $25 per share in the February, March, and April series. (Pl. 56.1 Stmt. ¶¶ 60, 62; SEC Index Ex. 17: Deposition of Giovanni DePompa dated Mar. 25, 2009 ("DePompa Dep.") at 62–63, 75–77, 96–99.)

By the end of the day on Friday January 26, Suman and Rahman had acquired a majority of all outstanding Molecular Devices options for $103,516 and 12,000 equity shares on the NASDAQ Exchange for $287,759.54. (Pl. 56.1 Stmt. ¶¶ 64–66, 69; E*Trade Statements at Bates No. MOL04720.)

On Monday January 29, MDS announced its friendly tender offer for Molecular Devices. (Pl. 56.1 Stmt. ¶ 75.) According to the Form 8–K, MDS offered $35 per Molecular Device share. (Molecular Devices Corp. Form 8–K dated Jan. 29, 2007, available at http://www.sec.gov/ Archives/ edgar/data/1003113/0000950 13407001504/f26807e8vk.htm.) On January 29, after the tender offer announcement, Molecular Devices' share price soared forty-five percent from $23.88 to $35.07 per share. (Pl. 56.1 Stmt. ¶ 77.) By the end of the trading day, the Rahman E*Trade Account had an unrealized gain of $906,300 on its 900 call options and a potential profit of $133,140 on Molecular Devices shares. (Pl. 56.1 Stmt. ¶¶ 78–79.) That day, Suman and Rahman also began selling their Molecular Devices shares and exercising call options. (Pl. 56.1 Stmt. ¶¶ 85–86; E*Trade Statements at Bates Nos. MOL04716–MOL04723). Their trading attracted the attention of regulators.

On February 1, the Ontario Securities Commission (the "OSC") contacted Suman regarding his trading in Molecular Devices stock. (Pl. 56.1 Stmt. ¶ 87.) He met with OSC investigators the following day and offered several explanations for his trading activity:

The developments that I was aware of were, first of all, the company got up-graded by Matrix Research. That's an analyst firm. And then it won a patent, a new patent for a biotechnology company. When they win a new patent, that always means the stock price goes up significantly. That was the other development. And they released a new product that also looked very positive on that company.

(SEC Index Ex. 29: Ontario Securities Commission Voluntary Interview of Shane Suman dated Feb. 2, 2007 ("OSC Interview") at 000018.) OSC investigators asked to examine his computer. Before turning it over, Suman installed an application known as "Window Washer" and deleted data from his hard drive. (Pl. 56.1 Stmt. ¶¶ 88–89.)

January 2007 was a phenomenal month for Suman and Rahman—the Rahman E*Trade Account jumped in value from $199,476.04 to $1,359,352.89. (E*Trade Statements at Bates Nos. MOL04709, MOL04716.) By comparison, in the prior twelve months, the Rahman E*Trade Account grew incrementally from $112,739.29 to $199,476.04 primarily through day-trading shares of large-cap stocks. (E*Trade Statements MOL04651–MOL04709). During February and March, they sold additional shares and began exercising their call options. Thus, they were able to purchase shares of Molecular Devices for $25 per share and sell them immediately for more than $35 per share. (Pl. 56.1 Stmt. ¶ 85; E*Trade Statements at MOL04725–MOL04740.)

On July 24, 2007, the SEC filed this action seeking disgorgement of all ill-gotten gains from Defendants' Molecular Devices trading, an injunction against further securities law violations, and a civil penalty. Over the course of this litigation, Defendants asserted their Fifth Amendment privilege not to testify and then refused to make initial disclosures under Fed.

R.Civ.P. 26(a), failed to comply with SEC discovery requests, disobeyed several court orders, and generally obstructed the progress of this civil action. (Transcript of June 19, 2009 Conference at *2–4, 6–7, 13–15; SEC Index Ex. 5: Email from David Smyth to Defendants dated Jan. 16, 2009; SEC Index Ex. 6: Emails between parties dated Jan. 29, 2009 and Jan. 30, 2009; SEC Index Ex. 8: Plaintiff's First Request for Admissions to Defendant Shane Bashir Suman; SEC Index Ex. 9: Letter from SEC to Defendants dated Mar. 10, 2009; SEC Index Ex. 10: Notice of Deposition dated Mar. 6, 2009; SEC Index Ex. 11: Email from Shane Suman to David Smyth dated Mar. 18, 2009; SEC Index Ex. 12: Letter from David Smyth to Defendants dated Mar. 20, 2009.) Based on their assertion of the Fifth Amendment, the SEC asks this Court to draw an adverse inference against Defendants and moves for summary judgment on all claims.

This Court has jurisdiction over the Exchange Act claims pursuant to 15 U.S.C. §§ 78u(d), 78u(e) and 78aa. Venue lies properly within the Southern District of New York pursuant to 15 U.S.C. § 78aa as certain alleged acts concerning the means and instrumentalities of interstate commerce occurred within this District.

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Davis v. Blige,* 505 F.3d 90, 97 (2d Cir.2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v.*

*S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has made the initial showing that there is no genuine issue of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment but must set forth "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original); *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348). In deciding a summary judgment motion, a court resolves all factual ambiguities and draws all factual inferences in favor of the non-moving party. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505; *Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir.2005).

Consistent with Local Rule 56.1, the SEC submitted "a statement of material facts as to which there is no genuine issue to be tried" totaling 94 paragraphs. Local Rule 56.1(b) requires that Defendants furnish "a correspondingly numbered paragraph responding to each numbered paragraph [in the SEC's statement]." Neither Defendant complied, despite receiving notice from the SEC, dated June 26, 2009, of the consequences if they failed to respond appropriately. *See Hernandez v. Coffey,* 582 F.3d 303, 307–08 (2d Cir.2009) (" '[n]otice is particularly important' because the *pro se* litigant 'may be unaware of the consequences of his failure to offer evidence bearing on triable issues'" (citations omitted)). Rather than comply, Defendants submitted a statement that generally

fails to respond to any of the specific facts enumerated by the SEC. "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir.2001). All of the facts Defendants failed to controvert in numbered paragraphs "will be deemed to be admitted" pursuant to Local Rule 56.1(c). *See S.E.C. v. Svoboda*, 409 F.Supp.2d 331, 337 & n. 1 (S.D.N.Y.2006) (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir.2003)); *see also S.E.C. v. Musella*, 678 F.Supp. 1060, 1061 (S.D.N.Y. 1988).

## II. *Applicability of Adverse Inference Against Defendants*

■ A court may draw an adverse inference against a party who asserts his Fifth Amendment privilege in a civil matter, *see Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), because the invocation of the privilege results in a disadvantage to opposing parties by keeping them from obtaining information they could otherwise get. *See Collazos v. United States*, 368 F.3d 190, 203–04 (2d Cir.2004) (noting that where the defendant "deprives the government of the opportunity to conduct a deposition . . . [that] itself supports an adverse inference"); *S.E.C. v. Brennan*, 230 F.3d 65, 76–77 & n. 1 (2d Cir.2000) (Calabresi, J., dissenting) (invocation of Fifth Amendment permits adverse inferences); *S.E.C. v. Invest Better 2001*, No. 01 Civ. 11427(BSJ), 2005 WL 2385452, at *2 (S.D.N.Y. May 4, 2005) (citing *United States v. 4003–4005 5th Ave.*, 55 F.3d 78, 82–83 (2d Cir.1995)); *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 683 F.Supp. 1411, 1449–50 (E.D.N.Y.1988). The Supreme Court "has recognized 'the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.' " *Mitchell v. United States*, 526 U.S. 314, 328, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (quoting *Baxter*, 425 U.S. at 318, 96 S.Ct. 1551). Such an inference may be drawn in a civil disgorgement action. *See S.E.C. v. Tome*, 638 F.Supp. 629, 631–32 (S.D.N.Y.1986) (Pollack, J.). Moreover, it is firmly established that "an adverse inference is equally to be drawn where the government is a party to a civil proceeding." *Tome*, 638 F.Supp. at 632 (collecting cases); *see also S.E.C. v. Musella*, 578 F.Supp. 425, 429–30 (S.D.N.Y. 1984).

"While the strength and cogency of the adverse inference should, of course, be tested against the other evidence in the case, 'the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation.' " *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir.1997), *aff'd in part, rev'd in part on other grounds*, 178 F.3d 114 (2d Cir. 1999) (quoting *4003–4005 5th Ave.*, 55 F.3d at 83). "An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." *LiButti*, 178 F.3d at 120 (citations omitted); *see also United States ex rel. Bilokumsky*, 263 U.S. 149, 153–54, 44 S.Ct. 54, 68 L.Ed. 221 (1923) ("Silence is often evidence of the most persuasive character."). However, a motion for summary judgment cannot be granted on an adverse inference alone; rather, the inference must be weighed with other evidence in the matter in determining whether genuine issues of fact exist. *See LiButti*, 178 F.3d at 124; *S.E.C. v. Pittsford Capital Income Partners, L.L.C.*, No. 06 Civ. 6353(MAT), 2007 WL 2455124, at *14–15 (W.D.N.Y. Aug. 23, 2007) (considering adverse inference as one of several grounds to grant SEC's motion for summary judgment); *see also Invest Better*

*2001*, 2005 WL 2385452, at \*2 (applying adverse inference in SEC's summary judgment motion).

■ Defendants' assertion of the Fifth Amendment in this civil action warrants this Court drawing an adverse inference. Here, the absence of criminal charges means the predicates for a "cost-free" assertion of the privilege are not present *See McKune v. Lile*, 536 U.S. 24, 41–42, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) ("It is well settled that the government need not make the exercise of the Fifth Amendment privilege cost free."); *see Tome*, 638 F.Supp. at 632 (citing *Hoover v. Knight*, 678 F.2d 578, 582, 582 n. 1 (5th Cir.1982)). This inference balances the equities after Defendants failed to give the SEC material which they were entitled to as an opposing party. The inference is also buttressed by Suman's destruction of information on his hard drive and Defendants' failure to comply with discovery orders. Through this behavior, the Defendants evinced their intention to unduly complicate this matter and burden the SEC. *See Kyoei Fire & Marine Ins. Co., Ltd. v. M/V Maritime Antalya*, 248 F.R.D. 126, 145 (S.D.N.Y. 2007) (finding that while a default judgment was inappropriate, an adverse inference was an appropriate remedy for discovery abuses'); *El–Yafi v. 360 East 72nd Owners Corp.*, 164 F.R.D. 12, 17 (S.D.N.Y. 1995) (imposing sanctions as "strong medicine" for failure to appear at depositions).

### III. *Insider Trading under Section 10(b) and Rule 10b–5*

Section 10(b) of the Exchange Act prohibits insider trading on undisclosed material non-public information. *See United States v. O'Hagan*, 521 U.S. 642, 650–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 168–69 (2d Cir.1999).

■ This case presents a paradigm for the misappropriation theory of insider trading because Suman owed a duty to MDS—his information source. A 10b–5 violation arises when "a person trades while in knowing possession of material non-public information that has been gained in violation of a fiduciary duty to its source." *United States v. Cusimano*, 123 F.3d 83, 87 (2d Cir.1997) (citing *O'Hagan*, 521 U.S. at 652, 117 S.Ct. 2199); *see United States v. Royer*, 549 F.3d 886, 899 (2d Cir.2008) ("We consequently adhere to the knowing possession standard."). "Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *O'Hagan*, 521 U.S. at 652, 117 S.Ct. 2199. The misappropriation theory prevents the disclosure of confidential information even where a person "owe[s] no fiduciary or other duty to [the corporation whose shares he is trading.]" *See S.E.C. v. Dorozhko*, 574 F.3d 42, 50–51 (2d Cir.2009) (noting that a duty is not necessarily required to establish liability); *United States v. Carpenter*, 791 F.2d 1024, 1031–32 (2d Cir.1986); *S.E.C. v. Lyon*, 605 F.Supp.2d 531, 541 (S.D.N.Y.2009). To prove liability, a plaintiff must establish "(1) that the defendant possessed material, nonpublic information; (2) which he had a duty to keep confidential; and (3) that the defendant breached his duty by acting on or revealing the information in question." *Lyon*, 605 F.Supp.2d at 541 (citing *United States v. Falcone*, 257 F.3d 226, 232–33 (2d Cir.2001)).

### a. *Possession of Material Non–Public Information*

A § 10(b) violator must possess information that is both material and non-public. *See Lyon*, 605 F.Supp.2d at 541 (citing

*S.E.C. v. Warde,* 151 F.3d 42, 47 (2d Cir. 1998)).

### 1. *Possession*

The SEC must first establish that Suman *possessed* material non-public information. *See Falcone,* 257 F.3d at 232–33. Although the SEC cannot isolate the moment when Suman became aware of the contemplated tender offer, he had many opportunities to acquire such knowledge. The evidence shows Suman learned of MDS's bid for Molecular Devices no later than January 23, 2007. As far back as December, Young questioned Suman about the capacity of the email system to absorb an upcoming acquisition. Later, Suman gained access to Penner's Blackberry and searched for the tender offer announcement on Halligan's computer. Suman's knowledge is also confirmed by the unusual timing and volume of trading. Suman's erasure of computer files following his OSC interview removes all doubt. *See S.E.C. v. Heden,* 51 F.Supp.2d 296, 300 (S.D.N.Y.1999) (considering attempts to hide transactions as evidence of improper trading). Finally, Suman's only counter— his story about an analyst report and a patent—is insufficient to create a genuine dispute as to material fact.

### 2. *Material Non–Public Information*

■ Information is material if " 'there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest].' " *Lyon,* 605 F.Supp.2d at 541 (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Indeed, "there must be a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information ... available." *Basic,* 485 U.S. at 231–32, 108 S.Ct. 978 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Information becomes public when it achieves " 'a broad dissemination to the investing public generally and without favoring any special person or group.' " *Lyon,* 605 F.Supp.2d at 541 (quoting *Dirks v. S.E.C.,* 463 U.S. 646, 653 n. 12, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983)). Information about a merger is frequently material and often becomes so "at an earlier stage than would be the case as regards lesser transactions." *S.E.C. v. Mayhew,* 121 F.3d 44, 52 (2d Cir.1997) (quoting *S.E.C. v. Geon Indus., Inc.,* 531 F.2d 39, 47 (2d Cir.1976)). "[W]here information regarding a merger originates from an insider, the information, even if not detailed, 'takes on an added charge just because it is inside information.' " *Mayhew,* 121 F.3d at 52 (citation omitted).

■ Under any definition, MDS's tender offer for Molecular Devices was material. A reasonable investor would have wanted information about the merger, if only to take advantage of the likelihood that the news would increase the share price as, in fact, it did. *See Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 166 (2d Cir.1980) ("We discussed the meaning of 'materiality' ... that the disclosed information must be 'reasonably certain to have a substantial effect on the market price of the security.' " (citation omitted)). Moreover, the information was non-public and MDS took extraordinary measures to keep the potential acquisition confidential, from requiring employees to sign confidentiality agreements to assigning a codename to the merger. *See Mayhew,* 121 F.3d at 52 ("a major factor in determining whether information was material is the importance attached to it by those who knew about it" (citation omitted)). The spike in the price of the stock on the date of the tender offer underscores the materiality of Suman's non-public information.

### b. Duty of Confidentiality

An insider's duty of confidentiality to his information source is the cornerstone of a misappropriation case. *See Lyon*, 605 F.Supp.2d at 542; *see also O'Hagan*, 521 U.S. at 652, 117 S.Ct. 2199 ("the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information"). A duty exists when "there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties." *Falcone*, 257 F.3d at 234 (citation omitted). To establish acceptance, the plaintiff must show defendant was on notice of his duty not to use or disclose the material non-public information. *See Lyon*, 605 F.Supp.2d at 545; *S.E.C. v. Musella*, 748 F.Supp. 1028, 1037–38 (S.D.N.Y.1989), *aff'd*, 898 F.2d 138 (2d Cir. 1990). Misrepresentation is fraudulent irrespective of any duty, but silence is fraudulent only where there is a duty to disclose. *See Dorozhko*, 574 F.3d at 48 (discussing cases).

■ Suman had a duty of confidentiality to MDS. He signed the MDS Personal Pledge and covenanted not to use information about planned business acquisitions to trade in securities in companies "seeking to do business with MDS." As a contractor with the company for several years, and then an employee, Suman was aware that the company assigned codenames to confidential projects. While Suman acknowledges his fiduciary duty, he counters that he was unaware of the deal. Nothing other than his *ipse dixit* supports that astonishing proposition. Such a conclusory assertion is insufficient to create a material issue of fact.

### c. Breach of Duty

■ Insiders with a duty to protect confidential information must misappropriate that information to trigger liability. *Lyon*, 605 F.Supp.2d at 547. "This element is satisfied ... not when the fiduciary gains the confidential information, but when, without disclosure to his principal, he uses the information to purchase or sell securities. The securities transaction and the breach of duty thus *coincide*." *O'Hagan*, 521 U.S. at 655–56, 117 S.Ct. 2199 (emphasis added). "Use" of information is broadly defined to include trades conducted while in "knowing possession" of material non-public information obtained in breach of a duty. *United States v. Royer*, 549 F.3d 886, 899 (2d Cir.2008); *see also United States v. Teicher*, 987 F.2d 112, 120–21 (2d Cir.1993) ("[A] 'knowing possession' standard comports with the oft-quoted maxim that one with a fiduciary or similar duty to hold material nonpublic information in confidence must either 'disclose or abstain' with regard to trading."). Where a fiduciary is not in a position to make a public statement regarding the acquired information, his only choice is to not trade in the securities. *See Teicher*, 987 F.2d at 120.

■ Because he was in knowing possession of information regarding the deal, Suman breached his fiduciary duty the moment he began acquiring options and purchasing shares in Molecular Devices. Suman's yarn—that a $100,000 per year MDS employee could corner the market on call-option securities in a company MDS was about to acquire based only one an analyst report—is so outlandish and unsupported by the record that it is not worthy of a jury's consideration. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of *factually unsupported claims* or defenses, and [ ] it should be interpreted in a way that allows it to accomplish this purpose."

(emphasis added)). Moreover, Rahman advances no explanation why a recreational day-trader would invest in risky short-term call option securities and borrow the money to take that gamble. Finally, "knowing possession" only requires the SEC to show Suman's awareness of (as opposed to use of) the nonpublic information. *See Royer*, 549 F.3d at 899.

Accordingly, this Court grants the SEC's motion for summary judgment on its § 10(b) and Rule 10b–5 claims against Suman.

### IV. *Insider Trading by a Tippee*

■ A § 10(b) violator can proliferate the damage by informing others of misappropriated confidential information. *See Dirks v. S.E.C.*, 463 U.S. 646, 659, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) (citing 15 U.S.C. § 78t(b)) ("Not only are insiders forbidden by their fiduciary relationship from personally using undisclosed corporate information to their advantage, but they may not give such information to an outsider for the same improper purpose of exploiting the information for their personal gain."); *see also Svoboda*, 409 F.Supp.2d at 340. When a violator "tips" another individual, the "tippee" also becomes liable under § 10(b) and Rule 10b–5. *Svoboda*, 409 F.Supp.2d at 340. Tippee liability arises when there is "(1) a breach by the tipper of a duty owed to the owner of nonpublic information; and (2) the tippee [ ][has] knowledge that the tipper had breached the duty." *Falcone*, 257 F.3d at 232; *but see Dorozhko*, 574 F.3d at 49 (noting that "nondisclosure in breach of a fiduciary duty 'satisfies § 10(b)'s requirement' ... however, what is sufficient is not always what is necessary, and none of the Supreme Court opinions considered ... *require* a fiduciary relationship as an element of an actionable securities claim under Section 10(b)" (emphasis in original)).

■ The SEC contends that Rahman traded on material non-public information received from her husband Suman and is subject to tippee liability. As Suman's insider trading violation has been established, the only issue is whether Rahman was aware of his breach when she traded in Molecular Devices securities. The unchallenged evidence put forward by the SEC establishes Rahman's knowledge. Suman admitted that he and Rahman both used Rahman's E*Trade Account to purchase Molecular Devices stock and that Rahman made her purchases while in Utah: "Some of them were my wife and some of them were me." *See* OSC Interview at 13. Moreover, Rahman offers no explanation for the unusually long 100–minute phone call between the couple on the eve of their buying spree in Molecular Devices. *See S.E.C. v. Ginsburg*, 362 F.3d 1292, 1299 (11th Cir.2004) ("The temporal proximity of a phone conversation between the trader and one with insider knowledge provides a reasonable basis for inferring that the basis of the trader's belief was the inside information."). The applicability of the adverse inference is particularly warranted with respect to this phone call, as Defendants' silence permits only one reasonable inference about the topics discussed—MDS and Molecular Devices. This inference is appropriate in light of Suman's spoliation of evidence to hamper an ongoing OSC investigation. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir.2001) ("Such an obligation [not to destroy evidence] usually arises when a "party has notice that the evidence is relevant to litigation ... but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." "). Finally, given their relationship as husband and wife and the huge profit Rahman made in just a couple of days, the implication of insider

trading is overwhelming. *See Ginsburg,* 362 F.3d at 1299 ("The factfinder in an insider trading case need only infer the most likely source of [a] belief.").

## V. *Section 14(e) and Rule 14e–3 Violations*

■ Section 14(e) and Rule 14e–3 proscribe fraud in connection with the tender offer of a security. *See* 15 U.S.C. § 78n(e); 17 C.F.R. § 240.14e–3(a). A person violates Rule 14e–3 "if he trades on the basis of material nonpublic information concerning a pending tender offer that he knows or has reasons [sic] to know has been acquired 'directly or indirectly' from an insider of the offeror or issuer, or someone working on their behalf." *Svoboda,* 409 F.Supp.2d at 341 (quoting *O'Hagan,* 521 U.S. at 669, 117 S.Ct. 2199). Unlike Suman's § 10(b) violation in this case, a § 14(e) violation requires no breach of fiduciary duty by the insider trader. *O'Hagan,* 521 U.S. at 669–70, 117 S.Ct. 2199. "Liability only attaches when a person or entity 'has taken a substantial step' or steps to commence a tender offer." *Svoboda,* 409 F.Supp.2d at 341 (citations omitted). Where the purchase or sale of a security occurs with knowledge of this tender offer, "it shall constitute a fraudulent, deceptive, or manipulative act or practice." 17 C.F.R. § 240.14e–3(a).

■ MDS took a "substantial step" toward the acquisition of Molecular Devices by means of a tender offer and Defendants were aware of the bid. In December 2006, MDS assigned the deal a codename—Project Monument. *See Mayhew,* 121 F.3d at 53 (finding a substantial step where company had "retained a consulting firm, signed confidentiality agreements, and held meetings between top officials"). Suman interacted with the Due Diligence Team on several occasions. He initiated internet searches using information he gleaned from those conversations. There-

after, Defendants purchased shares and cornered the call option market in the target company. They made a huge gamble on a sure thing, knowing that Molecular Devices' price would soar when MDS announced its tender offer at $35 per share. *See Am. Standard Inc. v. Crane Co.,* 510 F.2d 1043, 1053 (2d Cir.1974) ("tender offers 'often operate to the great benefit of stockholders of the target corporation' " (citation omitted)).

## VI. *Requested Relief*

Having granted summary judgment to the SEC on the insider trading claims against Defendants, this Court turns to the issue of equitable and monetary relief.

### a. *Permanent Injunction*

■ Where it "appear[s] to the [SEC] that any person is engaged or about to engage" in acts that constitute or will constitute violations of the securities laws, a court may within its discretion enter a permanent injunction against the individual to restrain such acts. 15 U.S.C. § 78u(d)(1). "An injunction prohibiting a party from violating statutory provisions is appropriate where 'there is a likelihood that, unless enjoined, the violations will continue.' " *S.E.C. v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1477 (2d Cir.1996) (quoting *Commodity Futures Trading Comm'n v. Am. Bd. of Trade, Inc.,* 803 F.2d 1242, 1250–51 (2d Cir.1986)). In granting injunctive relief a court considers "(1) whether the defendant has been found liable for illegal conduct; (2) the degree of scienter exhibited; (3) whether the violation was an isolated incident; (4) whether the defendant continues to maintain that his past conduct was blameless; and (5) whether, by reason of his professional occupation, defendant might be in a position which may provide opportunity for future violations." *S.E.C. v. Freeman,* 290

F.Supp.2d 401, 406 (S.D.N.Y.2003) (citations omitted).

 Applying these factors to Suman and Rahman, this Court finds a permanent injunction is appropriate. The boldness of Defendants' violation of the securities laws warrants a meaningful remedy. *See, e.g. Freeman*, 290 F.Supp.2d at 406 ("conduct did not entail an isolated instance, but occurred in a continuous and systematic pattern"). Despite their apparent modest means, Suman and Rahman managed to orchestrate a fraud that netted them more than $1 million. Suman misled Canadian investigators and then deleted incriminating evidence from his computer. Finally, Suman's expertise with computers and internet security catapults him to "a position that may provide opportunity for future violations" and poses a continuing threat to the securities markets. *See Svoboda*, 409 F.Supp.2d at 342–3.

Accordingly, Defendants are permanently enjoined from violating Section 10(b) of the Exchange Act and Rule 10b–5.

b. *Disgorgement and Prejudgment Interest*

 A court may order disgorgement of the ill-gotten gains of a securities fraud. *See S.E.C. v. Patel*, 61 F.3d 137, 139 (2d Cir.1995); *Freeman*, 290 F.Supp.2d at 407 (disgorging profits after granting summary judgment to the SEC). "Disgorgement 'is a method of forcing a defendant to give up the amount by which he was unjustly enriched.'" *S.E.C. v. Johnson*, No. 03 Civ. 177(JFK), 2006 WL 2053379 (S.D.N.Y. Jul. 24, 2006) (citations omitted). Where a "stock is purchased on the basis of inside information, the proper measure of [disgorgement] damages is the difference between the price paid for shares at the time of purchase and the price of the shares shortly after the disclosure of the inside information." *Patel*, 61 F.3d at 139–40 (citing *S.E.C. v. Tex. Gulf*

*Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir. 1971)). A district court has "broad discretion" in determining the amount to be disgorged. *Svoboda*, 409 F.Supp.2d at 344 (citing *First Jersey*, 101 F.3d at 1474–75). "[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation." *Patel*, 61 F.3d at 139 (citing *S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989)). Further, "any risk of uncertainty in calculating the amount 'should fall on the wrongdoer whose illegal conducted created that uncertainty.'" *Svoboda*, 409 F.Supp.2d at 344 (quoting *Patel*, 61 F.3d at 139–40).

 Absent disgorgement, Suman and Rahman would profit handsomely from their fraud. Records submitted by the SEC show that Defendants stood to profit $1,039,440 from the Molecular Devices call options and shares. *See S.E.C. v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir.1974) (requiring disgorgement of "paper profits" as opposed to actual profits). This amount is a reasonable approximation of the profits from 12,000 shares and call options for 90,000 additional shares given the $11 per share price increase after the merger's announcement. *See Svoboda*, 409 F.Supp.2d at 344.

The imposition of joint and several liability is appropriate because of Suman and Rahman's close relationship as husband and wife, and their actions in concert with one another. *See S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir.1997) (citing *First Jersey*, 101 F.3d at 1475 (ordering joint and several liability where defendant was "intimately involved" in the fraud)); *see also Svoboda*, 409 F.Supp.2d at 346 (ordering joint and several liability where defendant "was to share equally in the proceeds of the fraudulent scheme he enabled"). Accordingly, Defendants are jointly and severally liable for $1,039,440 together with prejudgment interest at the

IRS underpayment rate. *See First Jersey,* 101 F.3d at 1476 (sanctioning use of IRS underpayment rate).

The SEC proposes that the disgorgement and the prejudgment interest be paid to the agency. But, a secondary goal of the securities laws is "compensation of fraud victims." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.,* 467 F.3d 73, 81 (2d Cir.2006) (Sotomayor, J.). Indeed, Sarbanes–Oxley "provides the SEC with flexibility" in this regard. *Unsecured Creditors of WorldCom,* 467 F.3d at 81. In view of this Congressional goal, this Court questions why the SEC has elected not to distribute such monies to the identifiable victims of the Defendants' fraud. Because "it remains within the court's discretion to determine how and to whom the money will be distributed," this Court directs the SEC to show cause why distribution of any monies collected to the Defendants' victims is not feasible or otherwise unreasonable. *See Unsecured Creditors of WorldCom,* 467 F.3d at 81 (citing *S.E.C. v. Fischbach Corp.,* 133 F.3d 170, 175 (2d Cir.1997)).

### c. Civil Penalties

Under the Insider Trading and Securities Fraud Enforcement Act, a court may impose a civil penalty not to exceed three times "the profit gained or loss avoided" from the defendant's insider trading. 15 U.S.C § 78u–1(a). In determining the appropriate penalty, a court considers the "facts and circumstances" of the particular matter, including "the defendant's culpability, the amount of profits gained, the repetitive nature of the unlawful act and the deterrent effect of a penalty given the defendant's net worth." *Svoboda,* 409 F.Supp.2d at 347 (quoting *S.E.C. v. Sekhri,* No. 98 Civ. 2320(RPP), 2002 WL 31100823, at *18 (S.D.N.Y. July 22, 2002)).

The SEC seeks the maximum possible penalty—$3,118,320—against Suman and Rahman jointly and severally. However, such a blunt punishment fails to calibrate the egregiousness of Suman's conduct when compared to his wife's. Suman was the primary violator who trolled for information at MDS, violated confidentiality agreements, misled OSC investigators, and destroyed evidence. In contrast, Rahman simply traded on tips from her husband.

 In fashioning the appropriate penalty, this Court notes that few SEC resources were required to ferret out the fraud—indeed, Canadian investigators interviewed Suman within days of his illegal activities. Moreover, the permanent injunction and disgorgement remedies should discourage future violations. And the magnitude of the penalty sought by the SEC may undermine its purpose by driving Defendants further underground. Nevertheless, the need to deter reprehensible fraudulent conduct warrants the imposition of a penalty. Accordingly, in the sound exercise of its discretion, this Court imposes a civil penalty of $2,000,000 on Suman and $1,000,000 on Rahman.

### CONCLUSION

For the foregoing reasons, this Court grants the SEC's motion for summary judgment on its claims under Section 10(b) of the Exchange Act and Rule 10b–5 and Section 14(e) of the Exchange Act and Rule 14e–3. Both Defendants Shane Bashir Suman and Monie Rahman are permanently enjoined from violating these statutes. Defendants are jointly and severally to disgorge $1,039,440 including prejudgment interest at the IRS underpayment rate. Finally, Defendant Suman is ordered to pay a civil penalty of $2,000,000 and Defendant Rahman is ordered to pay a civil penalty of $1,000,000.

The SEC is directed to submit a proposed judgment consistent with this memorandum and order by February 26, 2010.

The SEC is also ordered to show cause by February 26, 2010, why payment of any monies collected pursuant to the judgment should not be distributed to identifiable victims. The Clerk of Court is directed to terminate all pending motions.

SO ORDERED.